# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KEVIN C. BROCK, JR.,

    Defendant.

Case No. 5:18-cr-40110-HLT-1

## MEMORANDUM AND ORDER

Defendant Kevin C. Brock, Jr., charged with possession with the intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), moves to suppress the evidence seized during the August 13, 2018 traffic stop of a vehicle he was driving. Doc. 17. Mr. Brock contests the validity of the traffic stop, which he contends violated his Fourth Amendment rights because—among other reasons—it was not justified at its inception. Doc. 18. Because the Court finds that law enforcement did not have reasonable suspicion to believe that Mr. Brock had violated any traffic regulation warranting the stop, the Court grants Mr. Brock's motion and suppresses the evidence.

## I. BACKGROUND[1]

At approximately 7:30 or 7:45 a.m. on the morning of August 13, 2018, Special Agent Justin Olberding of the Drug Enforcement Agency ("DEA") called Topeka Police Department ("TPD") Officer Kimberly Hanika with information regarding an unknown individual allegedly in

---

[1] During the April 12, 2019 hearing on Mr. Brock's motion to suppress, the Court heard testimony from two law enforcement officers involved in the August 13, 2018 traffic stop and arrest of Mr. Brock: TPD Officer Hanika and KHP Trooper Clark. Based on the officers' demeanor and attentiveness during questioning—and given that, at times, the officers conceded facts not helpful to the Government's case—the Court credits their testimony. Although the Court credits each witness's testimony, the Court relays only those portions relevant to its resolution of the issues presented by the motion to suppress.

possession of illegal narcotics. Specifically, Agent Olberding informed Officer Hanika that the individual was driving a dark-colored Dodge Durango with a lawn mower strapped to the top and was in possession of a large amount of methamphetamine. Agent Olberding further reported that the individual was located in an area of Topeka known as "Little Russia." Upon receiving this information, Officer Hanika reached out to Trooper Brian Clark of the Kansas Highway Patrol ("KHP"). Officer Hanika requested that Trooper Clark—who is a canine handler assigned to the police service unit—bring his dog, Police Service Dog Chase, to the Little Russia area to conduct a dog sniff.[2]

Officer Hanika proceeded to drive to Little Russia and, at about 8:00 a.m., while sitting in her patrol car, observed a dark purple Durango with a lawn mower strapped to the top—matching the description of the vehicle provided by Agent Olberding—pull into a parking spot directly in front of Porubsky's Restaurant.[3] Officer Hanika watched as an individual—later identified as Mr. Brock—exited the Durango and stood near the vehicle on his phone. Although Mr. Brock had exited the vehicle, Officer Hanika could tell the vehicle was still on because she could hear the vehicle's exhaust running. Suspecting Mr. Brock of violating Topeka Municipal Code § 10.20.125(a), which renders it illegal for an individual to leave a vehicle running while "unattended," Officer Hanika exited her patrol car and called Mr. Brock over. At the time she called him over, Mr. Brock was still standing near his vehicle.[4]

---

[2] Officer Hanika's call to Trooper Clark was preemptive, as she had not yet located the unknown individual and, indeed, had not even arrived in the area where the individual was allegedly located.

[3] The record suggests that Porubsky's Restaurant is a private establishment and that Mr. Brock parked in its parking lot. Neither the Government nor Mr. Brock argues or discusses Officer Hanika's authority for enforcing an ordinance on what appears to be private property. Therefore, the Court does not reach this issue.

[4] At the hearing on Mr. Brock's motion to suppress, Officer Hanika stated that Mr. Brock was approximately "five feet" or "a few feet" away from his vehicle when she called him over. And the video evidence confirms that Mr. Brock was standing close to—and in the Court's estimation, less than ten feet away from—his vehicle during the August 13, 2018 traffic stop. The Government does not specifically argue, and the Court therefore does not address, that Mr. Brock was so far away from the vehicle to render it "unattended."

Making contact with Mr. Brock, Officer Hanika informed him that he was violating a city ordinance. Mr. Brock explained that he had exited his vehicle so that he could purchase a drink from the soda machine outside Porubsky's. Officer Hanika estimates the machine was located approximately five feet away from where Mr. Brock's vehicle was parked. Officer Hanika then asked Mr. Brock to provide his driver's license. Mr. Brock replied that his driver's license was "restricted" or "suspended" and instead provided Officer Hanika with a credit card. He also told Officer Hanika that the tags on the Durango were not registered to the vehicle.[5] Officer Hanika patted Mr. Brock down; no weapons or drugs were found on his person.

Officer Hanika proceeded to call dispatch to run Mr. Brock's name and date of birth through the system. Dispatch confirmed that Mr. Brock's driver's license was suspended. While she was on the phone with dispatch, Officer Hanika sent a message to Trooper Clark to inform him that she had stopped a vehicle matching the description provided by Agent Olberding. Officer Hanika allowed Mr. Brock to sit in the vehicle (which had since been turned off at her instruction) while she was speaking with dispatch. Officer Hanika did not handcuff or restrain Mr. Brock. Officer Hanika also allowed Mr. Brock to get a soda from the vending machine. During her testimony, Officer Hanika described Mr. Brock as "chatty" during their encounter. She further testified that Mr. Brock did not say anything or behave in such a way as to indicate he was under the influence of any drugs. Mr. Brock was not combative and did not try to prevent Officer Hanika (or, once he arrived, Trooper Clark) from approaching the vehicle or getting near the vehicle. Indeed, Officer Hanika testified that the only reason she suspected Mr. Brock was in possession

---

[5] During the hearing, Officer Hanika testified that she could not see the vehicle's tags—and, as such, could not observe that they were not legal—when she initially called Mr. Brock over. Officer Hanika emphasized during the hearing that the only traffic infraction she observed at the time she initially stopped the vehicle was an "unoccupied" vehicle.

of drugs was the information provided by Agent Olberding. After speaking with dispatch, Officer Hanika told Mr. Brock that she was going to start writing his citations.

Approximately 15 minutes after Officer Hanika initiated the traffic stop, Trooper Clark arrived on the scene with his dog. Trooper Clark made contact with Officer Hanika, who was standing with Mr. Brock. Officer Hanika asked Trooper Clark to run his dog around Mr. Brock's vehicle and then returned to her patrol car to begin writing Mr. Brock's citations. Trooper Clark approached the Durango to conduct the dog sniff. After the dog alerted to the presence of drugs, Trooper Clark searched the vehicle and discovered a crystal-like substance that he recognized as methamphetamine. Based on the evidence collected during the traffic stop and search of Mr. Brock's vehicle, a grand jury indicted Mr. Brock on December 12, 2018, for possession with the intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Doc. 1. Mr. Brock subsequently moved to suppress. Doc. 17.[6]

## II. STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; *see also Mapp v. Ohio*, 367 U.S. 643, 655-56 (1961) (incorporating the Fourth Amendment's protections against the states through the Fourteenth Amendment). Evidence obtained in violation of these rights is subject to suppression under the "exclusionary rule." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

---

[6] During the April 12, 2019 hearing on the motion to suppress, the Court ordered the parties to submit additional briefing, which the Court considered (in addition to the initial briefing on Mr. Brock's motion) in its analysis. *See* Docs. 22-23.

## III. ANALYSIS

### A. Constitutionality of the Traffic Stop

Mr. Brock moves to suppress the evidence found in his vehicle during the August 13, 2018 traffic stop. Because a traffic stop is a seizure under the Fourth Amendment, it must be reasonable. *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). The reasonableness of a traffic stop is analyzed under the framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* Under *Terry*, "a traffic stop is reasonable if it is (1) 'justified at its inception' and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) (internal citations omitted). Here, the Court's analysis focuses on the first part of the inquiry: the legal justification for the stop.

With respect to this first part, a stop is justified at its inception if it is based on an observed traffic violation or the officer has reasonable suspicion that the motorist violated an applicable traffic regulation. *United States v. Cunningham*, 630 F. App'x 873, 876 (10th Cir. 2015). The Supreme Court defines reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity" under a "totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The government bears the burden of proving reasonableness. *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). However, this is not an "onerous standard" and, indeed, requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause. *Id.* (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011); *see also United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). "As long as an officer has 'a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if

5

it is more likely than not that the individual is not involved in any illegality.'" *Id.* at 1379-80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)).

Particularly pertinent for purposes of this motion is the "newly minted" principle that <u>reasonable suspicion can rest on a mistake of law</u>. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014); *see also Cunningham*, 630 F. App'x at 874; *United States v. Perez-Madrigal*, 2017 WL 2225221, at *3 (D. Kan. 2017). This mirrors the longstanding principle that an officer's reasonable mistake of fact does not render a seizure—particularly a traffic stop—unconstitutional. *Cunningham*, 630 F. App'x at 874. Although traditionally drawing the line at mistakes of fact, holding that an officer's mistake of law, even if reasonable, cannot excuse an improper stop, the Tenth Circuit recently changed course in light of the Supreme Court's holding in *Heien v. North Carolina*. *Id.* The mistake-of-law doctrine is subject to the following ground rules: (1) the analysis is objective, and therefore the officer's subjective understanding of the law is irrelevant; (2) the doctrine is not as forgiving as the doctrine of qualified immunity; and (3) the officer's mistake of law may be reasonable if the law is ambiguous—i.e., if reasonable minds could differ on the interpretation—and has never been construed by the relevant courts. *Perez-Madrigal*, 2017 WL 2225221, at *3 (citing *Cunningham*, 630 F. App'x at 876-77).

In this case, Officer Hanika testified during the hearing on this motion that she stopped Mr. Brock because she suspected him of violating Topeka Municipal Code § 10.20.125(a) ("Unattended motor vehicle—Ignition—Key and brakes") because he left his vehicle running while it was, in her words, "unoccupied." Section 10.20.125(a) provides:

> No person driving or in charge of a motor vehicle shall permit it to <u>stand unattended</u> without first stopping the engine, locking the ignition, removing the key from the ignition, effectively setting the brake thereon and, when standing upon any grade, turning the front wheels to the curb or side of the highway.

6

Topeka Municipal Code § 10.20.125(a) (emphasis added). In his motion to suppress and related briefing, Mr. Brock argues that Officer Hanika did not have reasonable suspicion that he violated § 10.20.125(a) so as to justify the stop and, therefore, the evidence must be suppressed. In response, the Government contends that Officer Hanika did have reasonable suspicion of a traffic violation. For the following reasons, the Court finds that Mr. Brock did not violate § 10.20.125(a) because—while the vehicle was "unoccupied"—it was not "unattended." And the Court further finds that it was not reasonable for Officer Hanika to mistakenly <u>believe</u> Mr. Brock's vehicle was "unattended." Therefore, the stop was not justified at its inception because it was neither (1) based on an observed traffic violation nor (2) supported by reasonable suspicion that the motorist violated an applicable traffic regulation.[7]

        **1.      The Stop Was Not Justified at Its Inception Because It Was Not Based on an Observed Traffic Violation**

The Court first turns to the point that "unattended" is not synonymous with "unoccupied." In reaching this conclusion, the Court considers the ordinance's language "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Courts determine plainness or ambiguity "by reference to the language itself, the specific context in which that language is used,

---

[7] In its supplemental briefing, the Government appears to argue that Officer Hanika had reasonable suspicion that Mr. Brock was <u>about</u> to leave his vehicle "unattended" (thereby violating the ordinance) because—in response to Officer Hanika calling out to him—Mr. Brock began "walking away" from his vehicle while it was still running. Doc. 23 at 3. The Government argues that, "[t]o an objective officer, it was reasonable to believe [Mr. Brock] was going to continue to walk away from his vehicle leaving it unattended." *Id.* The Court finds this argument unpersuasive. As the Government notes in its briefing, Officer Hanika testified that Mr. Brock was a mere five feet away from his vehicle, talking on his phone, when she called out to him. *Id.* From the Court's review of the video, it appears Mr. Brock was simply standing near his vehicle while talking on his phone. There is no evidence Officer Hanika knew or reasonably suspected that Mr. Brock would continue to walk away from the vehicle had she not called out to him—rather, Officer Hanika's belief amounted to a mere hunch. And although reasonable suspicion is not an onerous standard, it requires more than a hunch. *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010) (holding that an officer "must point to specific, articulable facts" to support an investigatory stop; "[i]nchoate suspicions and unparticularized hunches do not provide reasonable suspicion").

and the broader context of the statute as a whole." *Id.* at 341. "[I]f the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" then no further inquiry is required. *Id.* at 340 (internal quotations omitted).

Here, consideration of these factors leads the Court to conclude that "unattended" does not mean "unoccupied." Rather, these are distinct words that do not carry the same meaning. Webster's Third New International Dictionary defines "unattended" as "not attended," "lacking a guard, escort, caretaker, or other watcher," or "not watched with care, attentiveness, or accuracy." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2482 (3d ed. 1993); *see also* THE AMERICAN HERITAGE COLLEGE DICTIONARY 1467 (3d ed. 1993) (defining "unattended" as "[n]ot being attended to, looked after, or watched"). "Unoccupied," on the other hand, is defined as—among other things—"not occupied by inhabitants" or "vacant." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2505. These definitions make clear these words do not have the same meaning. The distinction between the two words is further borne out through a practical example. For example, in a residential community with a communal mailbox area, an individual may pull up within a few feet of the mailbox, leave his car running beside the mailbox, and exit the vehicle to collect his mail. Everyone would agree that the car was unoccupied. But no one would readily describe the car as "unattended." This example illustrates a simple point: these words are not interchangeable, and, for purposes of this case, a car may be unoccupied yet attended.[8]

Likewise, reviewing § 10.20.125(a) in conjunction with the surrounding provisions reinforces this reading of the ordinance. Subsection (b) of § 10.20.125 provides that "[f]or the

---

[8] There are several other examples that underscore this point. For example, consider a Federal Express driver who leaves his delivery truck running on the side of the road while carrying a package to a front door; his vehicle is running and unoccupied, but generally not "unattended." Or a parent exiting a running vehicle to walk their minor child to the front door. Again, the car would be left running and unoccupied but would hardly be considered "unattended."

8

purpose of this section, 'unattended' shall not be construed to mean a motor vehicle with an engine that has been activated by a remote starter system, when the motor vehicle is locked and when the ignition keys are not in the motor vehicle." Topeka Municipal Code § 10.20.125(b) (emphasis added). In cases where a vehicle's "remote starter system" has been activated, the car is almost certainly unoccupied. That is the entire point of such a system—to enable an individual not physically in a vehicle to nonetheless activate that vehicle remotely. However, the ordinance specifically states that such unoccupied vehicles are not to be considered "unattended." Thus, subsection (b) supports the inference that a car can be unoccupied yet attended and, broadly speaking, that "unattended" is not interchangeable with "unoccupied" within the meaning of § 10.20.125(a).[9] Thus, in light of the clear meaning from the dictionary definitions and surrounding statutory context, "unattended" does not mean "unoccupied." And Officer Hanika did not observe this traffic violation.

### 2. The Stop Was Not Justified at Its Inception Because It Was Not Supported by Reasonable Suspicion of a Traffic Violation

The Court now turns to its second point: in addition to the fact that "unattended" and "unoccupied" do not mean the same thing, it is not reasonable to think that they do. Put differently, the mistake of law that initially led to the traffic stop of Mr. Brock—i.e., Officer Hanika exchanging the word "unattended" in § 10.20.125(a) with "unoccupied"—was not objectively reasonable. In reaching this conclusion, the Court considers the ground rules articulated by the Tenth Circuit in *Cunningham* and set forth above. *See Cunningham*, 630 F. App'x at 876-77; *Perez-Madrigal*, 2017 WL 2225221, at *3.

---

[9] A review of subsection (b) also reinforces the inference that the policy underlying § 10.20.125 is to prevent vehicle theft. Here, Mr. Brock was mere feet away from his vehicle throughout the stop and the vehicle was not at any apparent risk of being stolen in this otherwise empty parking lot.

9

First, as dictated by *Cunningham*, the Court notes that Officer Hanika's subjective understanding of the law is irrelevant. At the hearing on the motion to suppress, Officer Hanika testified that she believed Mr. Brock violated § 10.20.125(a) by leaving his vehicle "<u>unoccupied</u>" and running. Officer Hanika testified that she understood "unattended," within the meaning of the ordinance, to mean that no one was present inside the vehicle. Doc. 21 at 42. Presented with the text of § 10.20.125(a), Officer Hanika stated that the ordinance says "[a vehicle] could not stand unattended. [Mr. Brock's] vehicle was unattended. No one was inside the vehicle. That is my understanding of the city ordinance." *Id.*; *see also id.* at 16 ("I explained to Mr. Brock that it was against city ordinance for him to leave his vehicle running, unoccupied."). Officer Hanika further testified:

> Mr. Haney: [I]n your mind at the time, unoccupied or unattended means essentially the same thing?
>
> Officer Hanika: Yes. Based upon my training and experience, yes.
>
> Mr. Haney: And based on your training and experience, anybody who gets out of a car where the engine is running, it's then both unoccupied and unattended?
>
> Officer Hanika: It would be unoccupied if they're not in it, and it's not being attended to.

*Id.* at 43. Officer Hanika's testimony on this point is clear: she believed an "unoccupied" vehicle left running equaled an "unattended" one. And the Court has no reason to doubt that Officer Hanika truly believed this meaning. Indeed, it deems her testimony credible. *See supra* note 1. But it simply does not matter what Officer Hanika believed, no matter how earnestly she believed it. Precedent dictates that the Court cannot consider her subjective understanding of the law in its calculus. *See Cunningham*, 630 F. App'x at 876.

Second, the mistake-of-law doctrine is not as forgiving as the one employed in the context of a qualified-immunity determination. The Supreme Court noted in *Heien* that "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." 135 S. Ct. at 539-40; *see also Corrigan v. District of Columbia*, 841 F.3d 1022, 1046 (D.C. Cir. 2016) (Brown, J., dissenting) ("What 'every reasonable' official would have understood to be 'clearly established' in case law is not the same question as what is 'objectively reasonable' for purposes of determining a Fourth Amendment violation.").

Third, although the mistake of law may be reasonable if the law is ambiguous and has never been previously construed by the relevant courts, this is not the situation under the specific facts of this case. Justice Kagan explained in her concurrence in *Heien* that the laws that might be amenable to "reasonable" mistakes are those that are "genuinely ambiguous" and that "pose[] a quite difficult question of interpretation" involving "hard interpretive work." 135 S. Ct. at 541-42 (Kagan, J., concurring); *see also Scott v. City of Albuquerque*, 711 F. App'x 871, 877 n.6 (10th Cir. 2017) ("Given our assessment of the unambiguous nature of [the ordinance], even if Officer Hensley had claimed a mistake of law, he could not avail himself of *Heien*'s holding."); *United States v. Diaz*, 854 F.3d 197, 204 n.12 (2d Cir. 2017) ("[I]t is only when the legal question is unsettled that an officer's erroneous assessment of the law can be objectively reasonable."). The Court's assessment of the relevant ordinance here required no difficult questions of interpretation or hard interpretive work. Indeed, Officer Hanika's mistake was not even in her "interpretation" or "misinterpretation" of the language of the relevant ordinance; rather, it was in her wholesale exchange of one word for another.

And, although it does not appear this particular ordinance has been construed by the Kansas courts, decisions from other courts support the Court's conclusion that "unattended" does not mean

"unoccupied." In *Texas-Oklahoma Express, Inc. v. United States*, cited by Mr. Brock in his briefing, the Tenth Circuit interpreted a Department of Transportation regulation providing that motor vehicles transporting class A explosives shall not be left "unattended" at any time during transportation. 429 F.2d 100 (10th Cir. 1970). Though the context of *Texas-Oklahoma Express* is distinguishable from the circumstances in this case, the Tenth Circuit's interpretation of the term "unattended" closely tracks the interpretation adopted by the Court here—that "unattended" does not simply equal "unoccupied." The Tenth Circuit stated:

> In addition to the bare dictionary definition, 'leaving a motor vehicle unattended' has been construed by the courts as related to particular facts, and expecially [sic] in reference to automobile theft insurance policies. The definition usually given requires that someone be in the car or in the immediate vicinity of the car who could prevent the theft. In *Dreiblatt v. Taylor*, the court held that a vehicle watched from an apartment window was unattended. The courts consider the relationship of the risk to the presence of someone immediately available who could prevent it.

*Id.* at 102 (internal citations omitted).

Likewise, the court in *People v. Cartmill*, 2013 WL 3968338 (Ill. App. 2013), reached a similar conclusion. Although *Cartmill* is an unpublished Illinois state court appellate opinion, it dealt with a nearly (and, for all intents and purposes, completely) identical municipal code provision, and the Court therefore finds its analysis relevant. In *Cartmill*, the defendant was charged with unlawful possession of cocaine with intent to deliver. 2013 WL 3968338 at *1. The defendant moved to suppress the evidence, arguing the arresting officer did not have articulable suspicion a crime had been committed when he stopped defendant for parking on striped lines and leaving the car running when he exited the vehicle. *Id.* The applicable ordinance provided: "No person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, and removing the key, or when standing upon any

perceptible grade, without effectively setting the brake thereon and turning the front wheels to the curb or side of the highway." *Id.* at 5. The state argued the defendant's vehicle was "unattended" because "unattended" means "no one in the vehicle." *Id.* at 6. The trial court rejected this argument and interpreted the ordinance to require "the owner or driver of a vehicle who leaves the keys in the ignition to ensure that it is guarded or watched over in such a manner so as to avoid the vehicle being set in motion by children, thieves, other intermeddlers or nonhuman agencies," ultimately holding that the defendant was only three to 20 feet away from the vehicle and therefore the vehicle was not "unattended." *Id.* at 6-7. The trial court accordingly granted the defendant's motion to suppress and the court of appeals affirmed. *Id.* at 7. Noting that the applicable ordinance did not define "unattended," the appellate court recognized it was "appropriate . . . to look to the dictionary to ascertain the plain and ordinary meaning of the word." *Id.* Citing Merriam-Webster's definition of "unattended," the court noted that "defendant had not left the vehicle 'unattended' without a guard, escort, caretaker, or watcher . . . as he had just exited the vehicle and was still nearby." *Id.* The court of appeals therefore held the investigatory stop was not justified at its inception. *Id.*

For these reasons, the Court therefore finds that the August 13, 2018 traffic stop of Mr. Brock was not justified at its inception because not only was Mr. Brock's vehicle not "unattended" within the meaning of § 10.20.125(a), Officer Hanika's mistake of law in <u>believing</u> Mr. Brock violated § 10.20.125(a) was not objectively reasonable—and therefore cannot support reasonable suspicion that Mr. Brock violated the ordinance.

### B.  Suppression of the Evidence

Finally, the Court addresses the Government's argument that—were the Court to agree with Mr. Brock that the seizure was improper—no basis exists for the Court to apply the exclusionary rule to suppress the evidence found during the search of Mr. Brock's vehicle. Doc. 23

at 8-10. The Government is correct that evidence obtained by law enforcement after a Fourth Amendment violation is not automatically subject to suppression under the exclusionary rule. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164-65 (10th Cir. 1995). The exclusionary rule applies "only where it 'result[s] in appreciable deterrence'" to future Fourth Amendment violations and the benefits of such deterrence outweigh the social costs of "letting guilty and possibly dangerous defendants go free." *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909-10 (1984)).

"The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143. Evidence should be suppressed where "'the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 348-349 (1987)). In *United States v. Leon*—relied upon by the Government in its argument on this point—the Supreme Court held that the exclusionary rule "cannot be expected, and should not be applied, to deter <u>objectively reasonable law enforcement activity</u>." 468 U.S. 897, 919 (1984) (emphasis added).

Here, the Court already held that Officer Hanika's mistaken belief that Mr. Brock violated the law was not an objectively reasonable one. It was not "objectively reasonable" for her to believe that an "unoccupied" vehicle fell within the ambit of § 10.20.125(a). Under the law, therefore, Officer Hanika may properly be charged with knowledge that her actions were unconstitutional. And under these circumstances, this has deterrent value. Again, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Heien*, 135 S. Ct. at 539-40. The Court holds that application of the exclusionary rule to suppress the evidence is the proper remedy here. The Court accordingly finds that the stop of

Mr. Brock's vehicle was constitutionally unreasonable and suppresses the evidence discovered following that stop.

## IV.    CONCLUSION

In sum, the Court finds that Mr. Brock did not leave his vehicle "unattended" within the meaning of Topeka Municipal Code § 10.20.125(a). The Court further finds that it was not reasonable for Officer Hanika to suspect that Mr. Brock left his vehicle "unattended" in violation of § 10.20.125(a). And because the mistake of law was not objectively reasonable, it cannot support reasonable suspicion. Under the totality of the circumstances, therefore, the Court finds that there was not reasonable suspicion that Mr. Brock violated § 10.20.125(a) so as to warrant the traffic stop. For these reasons, the Court grants Mr. Brock's motion to suppress the evidence seized during the August 13, 2018 traffic stop.

THE COURT THEREFORE ORDERS that Mr. Brock's Motion to Suppress (Doc. 17) is GRANTED.

IT IS SO ORDERED.

Dated: May 29, 2019             /s/  *Holly L. Teeter*
                                HOLLY L. TEETER
                                UNITED STATES DISTRICT JUDGE